# United States Court of Appeals
## For the First Circuit

---

No. 99-1246

CARMEN CARMONA, ETC., ET AL.,

Plaintiffs, Appellants,

v.

PEDRO A. TOLEDO, ET AL.,

Defendants, Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Jose Antonio Fuste, U.S. District Judge]

---

Before

Stahl, Circuit Judge,

Campbell, Senior Circuit Judge,

and Lynch, Circuit Judge.

---

Iris Y. Valentín-Juarbe for appellants.
Leticia Casalduc-Rabell with whom Gustavo A. Gelpi, Solicitor General, Edda Serrano-Blasini, Deputy Solicitor General, and Roxanna Badillo-Rodriquez, Assistant Solicitor General, United States Department of Justice, Federal Litigation Division, were on brief for appellees.

**CAMPBELL, Senior Circuit Judge.** Plaintiff-appellants appeal from the dismissal of their civil rights complaint against two unnamed officers of the Police Department of the Commonwealth of Puerto Rico and their supervisors. We hold that the district court erred in allowing defendant-appellees' motion for summary judgment before discovery was reasonably complete, as well as in denying plaintiffs' motion to amend the complaint to add the name of a newly identified officer. We remand for further proceedings not inconsistent with this opinion.

## I. BACKGROUND

Plaintiff-appellants Carmen Carmona and several of her family members (collectively, "plaintiffs") filed a complaint for damages against two unnamed police officers and their named supervisors.[1] Plaintiffs alleged the following: on January 21, 1994, two police officers pursued a robbery suspect into plaintiffs' neighborhood. At the time, Carmona was in the house with her two minor daughters, Enedi and Ileani. The officers entered plaintiffs' home by way of a door accessing the house

---

[1]Plaintiffs include Carmona; her minor daughter, Enedi Figueroa; Carmona's husband and Enedi's father, Javier Figueroa; and Javier's sons, Marcos and Omar Figueroa.

from the back patio. They did not identify themselves or show a search warrant. Once inside the enclosed back porch, they drew their service guns and pointed them at Carmona and her five-year-old daughter Enedi. The officers detained the two at gunpoint for approximately twenty-five minutes. One of the officers searched the home while the other continued to point his gun at Carmona and Enedi. The officers did not find anyone else in the home. They left without identifying themselves or explaining their actions.

Plaintiffs brought suit pursuant to 42 U.S.C. §§ 1983 and 1988 and Articles 1802 and 1803 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, §§ 5242 and 5243. They alleged that the defendant officers violated their rights under the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution by performing a warrantless entry of their home, holding them at gunpoint, and searching their home. They further alleged that the officers' supervisors, Pedro A. Toledo, the Superintendent of the Puerto Rico Police Department, and Aida M. Velez, the Director of Human Resources (collectively, "the supervisors"), deprived them of their rights by their deliberate indifference in carrying out supervisory responsibilities, permitting a pattern of illegal searches, arrests, and misuse of firearms, failing to properly investigate

-3-

such instances, and failing to adequately train and discipline the offending officers.

The supervisors assert the following facts: on January 21, 1994, two armed individuals robbed a bank located near the Rolling Hills Urbanization in Carolina, Puerto Rico. Approximately fifty officers from the Puerto Rico Police Department and the municipal police participated in the resulting search. The police were able to track the suspects, who were fleeing by car, by use of transponders fashioned to look like currency bills. The transponders (known as the "Pronet system") emit an electronic signal received by police cars, helicopters, and computers. Approximately an hour and a quarter after the robbery, the police arrested a suspect in the Rolling Hills Urbanization and recovered most of the stolen money. Another suspect was apprehended shortly thereafter.

According to the supervisors, police investigation procedures require that if the Pronet system locates the bills at a residence, officers must explain the situation and acquire verbal or written authorization from the resident before they may conduct a search. Where the resident does not give permission, police block the area while a search warrant is sought.

Later on January 21, 1994, the supervisors maintain, Carmona filed a complaint with the Puerto Rico Police Precinct, in which she alleged that an officer had entered her home during the search for the bank robbers and held her at gunpoint. She also contended that an interior wooden door was damaged. Carmona was unable to identify the officer.

The supervisors contend that on May 5, 1994, in response to Carmona's complaint, the Deputy Superintendent of Inspection and Disciplinary Affairs of the Puerto Rico Police Department ordered an investigation. A member of the Bank Robbery Division carried out the investigation, which included interviews with several officers involved in the bank robbery investigation, Carmona's account of the events, criminal proceedings reports, and Carmona's neighbors' written permission to search their homes. Following the investigation, a written report was rendered on July 12, 1994, concluding that there was no evidence of wrongdoing on the part of the police.

According to the supervisors, no other civilian complaints, either formal or informal, arose from the police conduct in the investigation of the bank robbery.[2] The police investigation of Carmona's complaint yielded statements from

[2]According to the supervisors, some neighbors complained about property damage caused by winds produced by the helicopter used in the search.

officers indicating that one of the suspects was apprehended approximately two houses away from plaintiffs' home, and that he had hid between plaintiffs' house and a neighbor's house.

On January 11, 1995, plaintiffs filed their complaint against the police officers and supervisors in the United States District Court for the District of Puerto Rico, seeking damages in the amount of $2,050,000.00. The supervisors moved to dismiss the complaint and to stay discovery on July 26, 1995, asserting that (1) plaintiffs had failed to state a claim under the heightened pleading requirements for civil rights claims; (2) the supervisors could not be liable in the absence of their direct involvement, deliberate indifference, or intentional failure to act; (3) plaintiffs failed to properly plead a Fourth Amendment claim under an objective reasonableness standard; and (4) plaintiffs Marcos, Omar and Javier Figueroa lacked standing to sue under 42 U.S.C. § 1983. Plaintiffs opposed the motion, arguing that it should be denied or at least deferred until plaintiffs had the opportunity to conduct meaningful discovery, including identifying the unnamed police officers. On September 12, 1995, plaintiffs served interrogatories and document requests aimed at identifying the unnamed officers and determining the circumstances of the incident. The interrogatories included several categories of requested

-6-

information:  (1) the identities of each person who participated in the search, had a supervisory role in the events, or who was in the chain of command of those identified; (2) the production of film, tapes or photographs of any part of the search or anyone who participated in the search; (3) the search participants' previous incidents of excessive force or illegal detention, search, seizure or arrest, and investigations or lawsuits resulting therefrom; (4) police regulations or guidelines governing officers' warrantless entry and searches of private residences and their use of service revolvers; and (5) allegations of misuse of firearms, excessive force or illegal search or arrest by any officer in the previous five years, and any investigation, formal action or discipline resulting therefrom.

The supervisors filed a motion for summary judgment on February 6, 1996, asserting defenses already set forth in their motion to dismiss as well as a defense of qualified immunity. The motion was accompanied by an unsworn statement of uncontested facts and an unsworn exhibit comprising the police department's file concerning the investigation of Carmona's complaint of January 21, 1994 ("the investigation file").  Based upon their qualified immunity defense, the supervisors also moved for a stay of discovery.

One day later, plaintiffs moved to compel discovery, seeking the supervisors' response to their interrogatories. Defendants opposed that motion on February 16. No ruling on this motion appears in the record before us.

On March 12, 1996, plaintiffs moved to strike the exhibit comprising the investigation file on the ground that it was inadmissible under Fed. R. Civ. P. 56(e) because it had not been properly authenticated.[3] On March 18, 1996, plaintiffs opposed the motion for stay of discovery and requested, pursuant to Fed. R. Civ. P. 56(f), that the summary judgment motion be held in abeyance until discovery was completed. This filing was accompanied by an affidavit by Carmona stating that plaintiffs needed discovery in order to oppose the supervisors' pending motions. The supervisors opposed these motions.

On May 7, 1996, plaintiffs moved for leave to serve additional interrogatories, noting that the supervisors had not yet responded to their first set of interrogatories. The new interrogatories included requests for information about, inter alia, the Pronet system, the internal investigation of Carmona's complaint, and the procedures followed in entering residences

---

[3]On April 3, 1996, the supervisors filed a "Motion Translating Tendered Exhibit to Motion for Summary Judgment," along with a document translating the investigation file into English. This document also was unauthenticated.

during the search. Plaintiffs also sought additional personnel information about the officers who had participated in the search, including promotions, demotions or firings, and complaints about conduct similar to that alleged in this case. The district court allowed plaintiffs' motion for leave on May 10, 1996, and plaintiffs served their second set of interrogatories on May 21, 1996. The supervisors sought reconsideration of the court's order, asserting that they were entitled to a stay of discovery.

On September 19, 1996, the district court allowed the supervisors' motion for summary judgment. The court stated that "Plaintiffs have neither adduced evidence by which to identify the officers who allegedly searched [the] residence nor explained why such evidence is not available." It concluded that "discovery can serve no purpose."

On October 7, 1996, plaintiffs moved for reconsideration, informing the court that Carmona had seen on a television newscast one of the unnamed police officers who had entered their home, and requesting additional discovery. They submitted a sworn statement by Carmona setting forth some of the events described in the complaint. In that statement, Carmona identified one of the officers who allegedly entered her home as an individual appearing in a still picture from a televised news

report, which plaintiffs attached as an exhibit. She provided a general physical description of the other unnamed officer, and stated that she could identify him if shown a picture or videotape.

On November 18, 1996, the district court, acknowledging that the parties had been confused about whether or not to proceed with discovery, set aside its September order and judgment and issued a scheduling order for additional discovery. The court stated that "plaintiffs' counsel has presented a valid argument about the fact that she was expecting responses to discovery in order to oppose the dispositive motions." On January 14, 1997, the parties submitted a modified discovery schedule, in which the supervisors agreed to answer both sets of outstanding interrogatories and to identify the police officer in the photo within thirty days. The court allowed that motion on January 24, 1997.

On April 9, 1997, plaintiffs moved to compel discovery, complaining that the supervisors had not provided the name of the officer Carmona identified by photo, nor had answered any other interrogatories. The motion was granted two days later, allowing the supervisors fifteen days to comply. On May 8, 1997, plaintiffs moved for a default judgment as a sanction for failing to comply with the discovery order. On May 15, the

-10-

supervisors opposed the motion, stating that a draft of their answers to interrogatories had already been submitted to police authorities. The district court denied plaintiffs' motion for default judgment without prejudice.

On June 25, 1997, plaintiffs filed a second motion for default judgment, asserting that the supervisors had continued to fail to comply with the outstanding discovery requests, some of which had been pending for nearly two years. Approximately two months later, the supervisors served answers to the interrogatories and gave proof of service to the court.[4] On October 16, 1997, the district court denied plaintiffs' motion for default judgment, stating that the supervisors had eventually responded to the discovery requests, albeit tardily. The court announced its intention to again review the supervisors' summary judgment motion, and allowed plaintiffs fifteen days to update their responses thereto.

On November 4, 1997, plaintiffs sought reconsideration of that order and an extension of time, on the ground that discovery still was not yet complete. Many of the answers to interrogatories received in September, they contended, were evasive or incomplete, and the supervisors (represented by new

---

[4]The substance of their response does not appear in the appellate record.

counsel) had agreed to a new schedule for the completion of discovery. Upon plaintiffs' motion, the district court allowed them until March 26, 1998, to respond to the supervisors' motion for summary judgment.

On January 22, 1998, the supervisors served amended answers to interrogatories. In February, 1998, plaintiffs notified the court that depositions of several police officers had been scheduled.[5] By March, 1998, the parties had filed additional informative motions, some jointly, as to the status of discovery. Nonetheless, on March 6, 1998, the district court reiterated its order that plaintiffs must file their opposition to summary judgment by March 26, 1998.

The parties continued to correspond about discovery, and on March 16, 1998, the supervisors produced copies of some personnel regulations and a manual on the use of firearms. On March 17, the supervisors stated that they had not been able to identify the unnamed officer appearing in the television report despite having posted his photograph in two police buildings.

The parties filed a joint motion on March 26, 1998, stating that "[c]ontrary to the Court's understanding, discovery has not concluded, there being several categories of documents and information that the defendants will not produce absent

---

[5]It appears that these depositions did not take place.

Court order." The joint motion further stated that "corresponding motions" would be filed within the next week and requested more time for plaintiffs to respond to the summary judgment motion. No motions for protective order or motions to compel appear to have been filed.

The parties continued to correspond regarding various discovery issues, and plaintiffs repeatedly pressed for further responses to their requests. In April, 1998, plaintiffs served requests for admissions, some of which went to the identity of the police officer in the photo. In a letter dated June 3, 1998, the supervisors provided that officer's name -- Frankie Cruz Ocasio -- but did not formally respond to the requests for admissions. On June 4, 1998, the supervisors produced documents concerning police policies as well as pages of a log book for January 21, 1994. Plaintiffs reiterated their pending discovery requests for information about Officer Cruz by letter and telephone in early July, 1998.

On July 3, 1998, the court reinstated its September 20, 1996, summary judgment in favor of all defendants, stating that plaintiffs had not filed an opposition despite repeated extensions of the deadline. On July 10, 1998, plaintiffs moved for reconsideration, asserting that they had been hampered by the supervisors' refusal to respond to discovery requests. They

-13-

also sought to amend the complaint to add the name of the officer who had been identified. The supervisors opposed plaintiffs' motions, contending that plaintiffs could have opposed summary judgment with the information they possessed at the time. On January 12, 1999, the district court denied the motion for reconsideration and for leave to amend the complaint. Plaintiffs appeal from the July 1998 order of summary judgment as well as the January 1999 order denying reconsideration and amendment.

## II.    DISCUSSION

Plaintiffs articulate four arguments on appeal. First, they contend that defendants did not carry their summary judgment burden, notwithstanding plaintiffs' failure to file any timely opposition. Second, plaintiffs argue that the court erred in allowing the supervisors' summary judgment motion before plaintiffs had the opportunity to complete sufficient additional discovery under Fed. R. Civ. P. 56(f). Third, they maintain that the court abused its discretion in denying plaintiffs' motion to leave to amend the complaint to add the name of the newly identified officer. Finally, plaintiffs contend that the court erred in dismissing their state law claims with prejudice. We hold that the ruling on summary

judgment was premature, and that plaintiffs should be permitted to amend their complaint to include Officer Cruz.

    A.    Summary judgment

    We review summary judgment de novo, construing the record in the light most favorable to the nonmovant and resolving all reasonable inferences in that party's favor. See Houlton Citizens' Coalition v. Town of Houlton, 175 F.3d 178, 184 (1st Cir. 1999). Plaintiffs contend that the moving party, the supervisors, failed to carry their summary judgment burden because the only documents supporting their motion were not authenticated as required by Fed. R. Civ. P. 56(c). Absent a valid affidavit or some other admissible evidence negating the supervisors' liability for the individual officers' alleged actions, plaintiffs argue that summary judgment should not have been awarded, especially in light of the supervisors' insufficient responses to plaintiffs' discovery requests seeking information about the identity of the two officers and the supervisors' role in training and supervising officers under their command.

    We agree that the supervisors' failure to authenticate precludes consideration of their supporting documents. Documents supporting or opposing summary judgment must be properly authenticated. See Fed. R. Civ. P. 56(e). "To be

admissible at the summary judgment stage, 'documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e).'" Orsi v. Kirkwood, 999 F.2d 86, 92 (4th Cir. 1993) (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 2722 at 382 (3d ed. 1998)); see also Cummings v. Roberts, 628 F.2d 1065, 1068 (8th Cir. 1980) (records attached to affidavit but not certified as required by Fed. R. Civ. P. 56(e) not properly considered by district court); Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc., 896 F.2d 1542, 1551 (9th Cir. 1989). Rule 56(e) requires that the affidavit be made on personal knowledge, set forth facts that would be admissible in evidence, and show affirmatively that the affiant is competent to testify to the matters stated therein. Moreover, "sworn or certified copies of all papers" referred to in the affidavit must be attached. See id.

The supervisors did not file an authenticating affidavit complying with Rule 56(e) to support their summary judgment motion. Rather, they simply appended a purported copy of the investigation file -- unsworn, uncertified, and, at first, untranslated -- to the motion.[6] Hence, neither the court

---

[6]Thereafter, the supervisors submitted a translated version of the investigation file with a one-page "Motion Translating Tendered Exhibit to Motion for Summary Judgment."

below nor this court may properly give any credence to the investigation file in assessing the supervisors' motion for summary judgment. See Orsi, 999 F.2d at 92; Cummings, 628 F.2d at 1068; Hal Roach Studios, 896 F.2d at 1551.

It is also true, however, that plaintiffs have produced no evidence -- through affidavits, discovery responses or the like -- from which a court or jury could determine, at trial, that the defendant supervisors are themselves liable for the two officers' alleged misdeeds. In an action brought under § 1983, supervisors are not automatically liable for the misconduct of those under their command. A plaintiff must show an "affirmative link" between the subordinate officer and the supervisor, "whether through direct participation or through conduct that amounts to condonation or tacit authorization." Camilo-Robles v. Zapata, 175 F.3d 41, 43-44 (1st Cir. 1999). In this summary judgment record, there is no evidence that the defendant supervisors failed adequately to train, supervise, investigate, or discipline the offending officers.

Plaintiffs did present evidence which, if believed, might suffice for a finding that the two police officers, though not the supervisors, had invaded plaintiffs' home and violated their constitutional rights. In an affidavit attached to plaintiffs' motion for reconsideration following the district

court's first order awarding summary judgment against plaintiffs, Carmona stated that none of the bank robbery suspects entered her house; that two unnamed police officers entered and searched her home without identifying themselves, showing a search warrant, or seeking written authorization; that they pointed their firearms at her and her child for approximately twenty-five minutes; and that they did not find the suspects in her home.[7] Nothing in the record before the district court, however, connected the defendant supervisors to the two officers' alleged misconduct.

A party moving for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); 10A Wright, Miller & Kane, supra, § 2727 at 455-56 (3d ed. 1998). The moving party is said to bear both the initial burden of production and the ultimate burden of persuasion on the motion.

---

[7]This affidavit was attached to a motion for reconsideration, not an opposition to summary judgment. However, under these circumstances, it still should be considered part of the record. "An affidavit of a party that is on file in the case will be considered by the court regardless of the purpose for which it was prepared and filed." 10A Wright, Miller & Kane, supra, § 2722 at 378 (3d ed. 1998). Hence, even though Carmona's affidavit was submitted to support a different motion, we take her sworn assertions as true in evaluating the summary judgment record. See id.

-18-

See 10A C. Wright, Miller & Kane, supra, § 2727 at 455-56, 487-88. Where the moving party lacks the ultimate burden of persuasion at trial, its initial burden of production is conventionally satisfied in one of two ways. The movant may affirmatively produce evidence that negates an essential element of the non-moving party's claim. See Adickes, 398 U.S. at 158. Alternatively, the moving party may point to evidentiary materials already on file -- such as answers to interrogatories, affidavits, or portions of depositions -- that demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).[8] A moving party may not satisfy its initial

---

[8] In Celotex, the plaintiff sued several asbestos manufacturers, including Celotex Corp., alleging her husband's death resulted from his exposure to products containing asbestos. Thirteen of the defendants moved for summary judgment, asserting that since Catrett had presented no evidence that her husband was ever exposed to any products that contained asbestos manufactured by the defendants, there was no genuine issue of material fact. The Supreme Court held that in this unusual situation, where neither party could prove either the affirmative or the negative of an essential element of the claim -- exposure to Celotex's products -- Celotex had met its burden by showing that Catrett would not be able to meet its burden of proof at trial. 477 U.S. at 322-23. Celotex met its burden by stating that Catrett "had failed to identify, in answering interrogatories specifically requesting such information, any witness who could testify about the decedent's exposure to [Celotex's] asbestos products." Id. at 320. The Court's inquiry did not end there, however. By meeting its burden, Celotex merely shifted the burden to Catrett to point to other portions of the record that would show that there was indeed a genuine issue of fact regarding the causation issue. Id. at

-19-

burden of production in this latter manner, however, if the non-moving party has not had adequate opportunity to discover material facts supporting its claim:

> The nonmoving party, of course, must have had sufficient time and opportunity for discovery before a moving party will be permitted to carry its initial burden of production by showing that the nonmoving party has insufficient evidence.

<u>Nissan Fire & Marine Ins. Co., Ltd.</u> v. <u>Fritz Companies, Inc.</u>, --- F.3d ----, 2000 WL 461462 at *5 (9th Cir. Apr. 25, 2000) (internal citations and quotations omitted); <u>see</u> <u>also</u> <u>Celotex</u>, 477 U.S. at 326 (parties had conducted discovery, and no serious claim could be made that non-moving party was "railroaded" by premature motion for summary judgment). A nonmoving party, even though having the ultimate burden at trial, may indeed have no obligation to offer evidence supporting its own case unless the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact. <u>See</u> <u>Adickes</u>, 398 U.S. at 160; <u>Clark</u> v. <u>Coats & Clark, Inc.</u>, 929 F.2d 604, 608 (11th Cir. 1991); <u>High Tech Gays</u> v. <u>Defense Indus. Sec. Clearance Office</u>, 895 F.2d 563, 574 (9th Cir. 1990).

The above principles are not always easily applied. <u>See</u> 10A Wright, Miller & Kane, <u>supra</u>, § 2727 at 463 (3d ed.

327.

1998). Courts are rightfully cautious about requiring a defendant to effectively "prove a negative" in order to avoid trial on a specious claim. See, e.g., BBS Norwalk One, Inc. v. Raccolta, Inc., 117 F.3d 674, 677 (2d Cir. 1997); Guarino v. Brookfield Township Trustees, 980 F.2d 399, 407 (6th Cir. 1992). Thus, if the summary judgment record satisfactorily demonstrates that the plaintiff's case is, and may be expected to remain, deficient in vital evidentiary support, this may suffice to show that the movant has met its initial burden. On the other hand, where, as here, plaintiffs' case turns so largely on their ability to secure evidence within the possession of defendants, courts should not render summary judgment because of gaps in a plaintiff's proof without first determining that plaintiff has had a fair chance to obtain necessary and available evidence from the other party. Otherwise, defendants will be encouraged to "stonewall" during discovery -- withholding or covering up key information that is otherwise available to them through the exercise of reasonable diligence.

Here, we think it premature to hold that the present gaps in plaintiffs' evidence of supervisory liability necessarily demonstrate plaintiffs' inability to establish an issue of material fact. As discussed infra, the supervisors' responses to plaintiffs' discovery requests appear to have been

-21-

meager, untimely, and incomplete.  The paucity of information produced and the information-gathering methods employed suggest that the supervisors may have been holding back or, at the very least, made only marginal efforts to uncover the requested information.  Despite plaintiffs' Rule 56(f) motion and repeated references to the incompleteness of discovery, the district court did not make findings nor hold a hearing as to the diligence and sufficiency of the supervisors' responses. Before ruling on summary judgment, we think that the district court should have looked more carefully into those issues and ascertained whether plaintiffs have received a full and fair chance to discover relevant information in the hands of defendants.

We realize that nearly three years elapsed between the time plaintiffs served their first interrogatories and the district court's final entry of judgment.  This period certainly was long enough for the parties to have completed adequate discovery.   During  this  time,  however,  defendants  were extraordinarily slow to respond and seem to have been reluctant to furnish the requested information.   The supervisors took nearly  two  years  to  serve  responses  to  the  original interrogatories -- and these failed to identify the two unnamed police officers who allegedly confronted Carmona and her

daughters in plaintiffs' home. It remains unclear whether defendants acted with diligence and good faith in attempting to identify those officers. Although the supervisors apparently provided logs containing names of on-duty officers for the relevant date, they seem not to have narrowed this information by identifying which officers participated in the bank robbery investigation. It seems incredible that defendants were unable to come up with the identities of the two officers. This is not to say that the supervisors did not exercise appropriate diligence -- merely that the absence of information calls, on its face, for further inquiry.

Moreover, twenty months elapsed between the time that Carmona identified an officer in a photograph as one who entered her home and the time that the supervisors provided his name. The supervisors' attempts to learn the officer's name by simply posting his photograph in two police buildings raises doubts as to the seriousness of their identification efforts. After defendants had, at long last, learned Officer Cruz's identity, they provided to plaintiffs only his name, badge number, and division. Despite plaintiffs' repeated requests, the supervisors seem not to have supplemented their answers to earlier interrogatories, as required by Fed. R. Civ. P. 26(e), to provide information about Officer Cruz's history, if any, of

-23-

incidents of excessive force or illegal detention, search, seizure or arrest; investigations or lawsuits resulting therefrom, if any; his chain of command, i.e, to whom he reported; or other personnel information. Nor do the supervisors appear to have answered requests for admissions that concerned Officer Cruz.

Furthermore, even the supervisors themselves seemed to doubt that discovery was complete at the time the court ordered plaintiffs to file their opposition to summary judgment. On March 26, 1998, the day that plaintiffs' opposition was due, the parties filed a joint motion stating that "[c]ontrary to the Court's understanding, discovery has not concluded.". The parties noted that there were categories of documents and information outstanding, and requested more time for plaintiffs to respond to the summary judgment motion.[9]

---

[9]The motion's joint nature did not, to be sure, justify the plaintiffs' failure to pay heed to the court's direction to file an opposition to defendant's motion for judgment. The fact that plaintiffs failed to file a timely opposition does not, however, require that the summary judgment be affirmed. See Mendez v. Banco Popular de Puerto Rico, 900 F.2d 4, 7 (1st Cir. 1990), and cases cited. Whether or not opposed, summary judgment can only be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Fed. R. Civ. P. 56(e) (if adverse party fails to respond, "summary judgment, if appropriate, shall be entered") (emphasis added).

The adequacy of the supervisors' response to plaintiffs' inquiries is a question of critical importance here, where the information plaintiffs sought was under the supervisors' control.

> [W]here the plaintiff's claim could only succeed upon a showing of actual or constructive knowledge on the part of supervisory personnel and where facts solely in the defendants' control were therefore at the heart of the necessary proof, the district court's failure to order compliance with the plaintiff's request for . . . discovery was an especially crippling blow.

Villante v. Department of Corrections of New York, 786 F.2d 516, 521 (2d Cir. 1986). As we have said, the supervisors' failure to identify the officers who allegedly committed the violation is a matter of particular concern, as is their failure to provide more information about the officer whose photograph plaintiffs submitted. See Davis v. Kelly, 160 F.3d 917, 921 (2d Cir. 1998), and cases cited (in § 1983 litigation, "courts have rejected the dismissal of suits against unnamed defendants described by roles . . . until the plaintiff has had some opportunity for discovery to learn the identities of responsible officials") (citations omitted); Gordon v. Leeke, 574 F.2d 1147, 1152 (4th Cir. 1978) (if plaintiff did not know identity of prison officers committing violation, court should have afforded him opportunity to discover them from prison warden).

-25-

The supervisors contend that plaintiffs have only themselves to blame for not coming up with evidence to support their claim. We leave this issue to the district court on remand, but we are not persuaded, at least at this time, that the fault lies with plaintiffs and their counsel. "When discovery is appropriately initiated, the burden of compliance lies foremost with the party from whom the discovery is sought." Resolution Trust Corp. v. North Bridge Assocs., Inc., 22 F.3d 1198, 1206 (1st Cir. 1994). The record suggests that plaintiffs have been reasonably diligent in pursuing their discovery requests, including attempting cooperative resolution of disputed issues and moving to compel discovery and for sanctions. A party that seeks discovery expeditiously is not obligated to "take heroic measures to enforce his rights against a recalcitrant opponent." See id. (plaintiff entitled to additional discovery under Fed. R. Civ. P. 56(f) from defendant before summary judgment could be adjudicated).

We are also unconvinced that much of the evidence that plaintiffs requested is irrelevant to the issue of supervisory liability, as the supervisors suggest. Whether an individual officer had a record of claims of excessive force, improper searches, or other related misconduct, as well as pertinent performance and disciplinary history, is relevant to the

-26-

allegations that the officer's conduct was linked to the supervisors' failure to properly train, supervise, and discipline him. See Barreto-Rivera v. Medina-Vargas, 168 F.3d 42, 49 (1st Cir. 1999) ("known history of widespread abuse sufficient to alert a supervisor to ongoing violations" can subject supervisor to liability even where he did not directly participate in civil rights violation) (quoting Maldonado-Denis v. Castillo-Rodriquez, 23 F.3d 576, 582 (1st Cir. 1994)). Moreover, information as to training received by the officers is obviously germane to the failure to train claim against the supervisors. This is not to say that each and every one of the requests was necessarily entitled to response. Some of the information sought may be privileged or undiscoverable for another legitimate reason. Such issues, however, need to be raised and specifically addressed if relied upon to justify defendants' failure to respond.

For all these reasons, we conclude that the district court erred in granting summary judgment without first making a closer examination into the question of defendants' diligence in providing relevant information during the discovery process. We therefore vacate the court's award of summary judgment and remand for further proceedings not inconsistent with this opinion. We do not hold that plaintiffs are entitled to

unlimited discovery or even that defendants are necessarily at fault for their failure to have produced any particular pieces of information. We hold only that the supervisors must timely produce all material, non-privileged information under their control, and they must act in good faith and with reasonable diligence. Once the district court determines that defendants have met their discovery responsibilities, it may then, if plaintiffs' case remains lacking in sufficient support, determine that defendants have carried their burden on summary judgment to establish the absence of a triable issue of fact. Presently, however, this case requires additional and active scrutiny by the district court to ensure that the supervisors comply with their discovery obligations. Hence, we vacate the order of summary judgment, and remand for further proceedings not inconsistent with this opinion.

### B. Leave to amend

On June 3, 1998, the supervisors provided Officer Cruz's name as the individual appearing in the photo. Plaintiffs continued to seek additional information about Officer Cruz after he was identified, and sought leave to amend their complaint to add his name on July 10, 1998. The district court denied that request, and plaintiffs now appeal from that order.

We review the district court's denial of leave to amend the complaint for an abuse of discretion, and defer to the district court "if any adequate reason for the denial is apparent on the record." Grant v. News Group Boston, Inc., 55 F.3d 1, 5 (1st Cir. 1995). Under Fed. R. Civ. P. 15(a), leave to amend shall be freely given when justice so requires. Therefore, we will not affirm the denial unless there appears to be an adequate reason for the denial, such as undue delay, bad faith, dilatory motive on the part of the movant, or futility of the amendment). See id. "Delay that is neither intended to harass nor causes any ascertainable prejudice is not a permissible reason, in and of itself to disallow an amendment of a pleading." Tefft v. Seward, 689 F.2d 637, 639 n.2 (6th Cir. 1982) (two-and-a-half year delay permissible); see also 6 Wright, Miller & Kane, supra, § 1488 at 659 (2d ed. 1990); Hurn v. Retirement Fund Trust of Plumbing, Heating and Piping Indus. of S. Calif., 648 F.2d 1252, 1254 (9th Cir. 1981).

We do not believe that plaintiffs' conduct was so dilatory as to deprive them of the opportunity to make use of this long-sought-after identification and proceed with their claims against Officer Cruz. See Island Creek Coal Co. v. Lake Shore, Inc., 832 F.2d 274, 278 (4th Cir. 1987) (three-month delay in seeking to amend complaint based on newly discovered

-29-

facts not unduly long).  Given that the claims against the individual officers were pending since the inception of this litigation and no new legal theories are involved in the amendment, we do not perceive surprise or prejudice to defendants nor any other reason for the district court's denial of plaintiffs' motion to amend.[10]  See 6 Wright, Miller & Kane, supra, § 1488 at 630-31 (2d ed. 1990).  Accordingly, we reverse that ruling.

Vacated and remanded for further proceedings not inconsistent with this opinion.

---

[10]The district court did not explain its denial of plaintiffs' motion, and the supervisors do not address this issue on appeal.